## Lockwood *versus* Lashell.

OR,

## Owners of the Caroline *v.* Owners of the Consignee.

1. Steamboats are required to do whatever sailing vessels going with a free or fair wind would be required to do under similar circumstances, with the difference, that steamers, having greater control over their movements, are held to a stricter rule of responsibility.

2. It is a rule of navigation recognised by law, that steam vessels meeting each other in a clear river, or on the open sea, shall, in case of danger of collision, *each pass to the right.* Exceptions, however, exist to the rule, but the party who alleges that his case is an exception must show the particular circumstances which take his case out of the general rule.

ERROR to the District Court of *Allegheny county.*

This was an action on the case by the owners of the steamboat Caroline against the owners of the steamboat Consignee, to recover damages sustained by a collision of the vessels.

The collision occurred on the night of the 9th of March, 1849, on the Ohio, about one hundred yards from the Virginia shore, the river being four hundred yards wide, and the water at a stage from eighteen to twenty feet deep. The Caroline, a small sternwheel boat, was ascending at a rate of three or three and a half miles an hour; the Consignee, a large side-wheel St. Louis boat, was descending at a speed of from ten to fifteen miles an hour. The Consignee, when the vessels first came in sight of each other, was descending the middle of the river.

On the trial, it was claimed by the plaintiffs that when the vessels came in sight of each other, the Caroline was in the act of crossing, had passed the middle of the river, and was nearing the Virginia shore. And that under these circumstances, it was the duty of the Consignee to have ported her helm and passed on the larboard or Ohio side, where there was abundance of room for passage; but that, on the contrary, her course was changed towards the Virginia shore, and the vessels thus came in collision.

On the other hand, the defendants claimed that when the Caroline was discovered she was ascending near to the Ohio shore, and that as the Consignee approached, the course of the Caroline was suddenly changed across the river, so as to pass improperly under the bows of the Consignee.

The actual place of the collision was designated by the anchor of the Caroline, which, falling from her bow at the time of the stroke, was found one hundred yards from the Virginia shore.

Under the charge of the Court, the case turned first upon the position of the Caroline when the Consignee came in sight; for if, as the defendants alleged the fact to be, she was ascending on the Ohio side and her course was changed so as to pass under the bows of the descending boat, the Judge charged that it was a "false move, and her owners could not recover."

[Lockwood *v.* Lashell.]

But if she did not make that move, and was in the position alleged by the plaintiffs, her helm ported and nearing the Virginia shore, then the case turned upon the correctness of the charge, that it was the duty of the Consignee, under such circumstances, to "port her helm" or pass "on the larboard."

The jury found that the Caroline *did not* "make the false move which the defendants think she did;" and the question was reduced to the inquiry, whether the Court erred in the law applicable to the circumstances of the case.

The charge of LOWRIE, J., was in part as follows:

"If this collision was intentional, the present form of action cannot be sustained. If it was purely accidental, or the result of faults on both sides, there is no remedy. Where both are in fault we do not measure the degrees of the faults that contribute to the loss. Here both vessels were moving, each colliding against the other, and that vessel which was guilty of the wrong move that gave rise to the disaster, must bear the loss, and this false move must be shown by the proof.

"The rules of navigation are very similar in form and spirit to the law of the road. There is no law requiring that people shall travel on any particular part of a road, and the usage is for each man to take that part of it which is best beaten, because he can travel it with the most ease. But he must regard the convenience and safety of others, and therefore, to avoid collision, or danger of collision, he must turn *to the right*. This rule, however, is not of absolute obligation, for it is not expected or demanded that a heavily laden vehicle shall leave the beaten road for one that is light, if sufficient room be left on either side, and no vehicle is expected to turn out for a footman or a horseman. So a vehicle crossing from one side of the road to the other is bound to see that it does not put itself in the way of another that is going along the road: 1 *Watts* 360; 2 *Chip.* 136; 1 *Pick.* 345; 1 *Stark.* 423; 2 *Esp.* 533; 5 *Id.* 273.

"These rules are simple, and founded on obvious reasons of convenience, and have but one arbitrary principle in them, and that is the requisition of turning to the right in case of danger of collision. Of a similar character are the rules of navigation. Thus, there is no rule requiring a vessel to occupy any particular part of the sea, or of a river. All rules of law are relative in their character, being intended to regulate conflicting claims. These claims arise only where vessels are in the vicinity of each other. In daylight this vicinity is at once discovered, and then the duty arises for each to regard the right of the other. At night the vicinity of another vessel is not so easily discovered, but the mere fact that two vessels are in the vicinity of each other changes the duties of both; and it is easily seen that in a crowded thorough-

[Lockwood *v.* Lashell.]

fare like our rivers and mouths of our ocean harbors, it is the duty of every vessel to give constant notice of her vicinity, by carrying a light in a dark night.

"Sailing vessels, meeting each other, are bound to endeavor to avoid collision. To do this, each must act according to rule, *and must presume that the other will do likewise.* Thus, if both vessels have the wind free, or abeam, they must both keep to the right. If that be their course they must keep it, if not they must port their helm. Each must calculate on this course being taken by the other. If one vessel is close hauled and the other free, the latter must give way and bear off, and the former *must* keep her course. The reason is plain—the vessel that is free is under command. So, if two vessels are meeting, one on the larboard and the other on the starboard tack, and each has the wind equal, she on the larboard tack must give way, and the other *must* hold her course.

"The resemblance of the rules of navigation to the law of the road is very striking when we refer to river navigation. Convenience fixes the usage. In a full river, descending boats keep the middle of the river, because that is favorable to their progress; ascending boats seek the slow water along the shores, because that is favorable to their progress. For the same reason, ascending boats cross at the bends of rivers, to shorten the distance, and keep out of the strong currents which set in against the outer side of a bend. Thus boats do not keep the right or the left of the river in their course, and their usage is founded on good sense and convenience, and is sanctioned by law. But, as in the law of the road, when they approach each other, then their duties change. They must avoid a collision. Now, the question of mere convenience is set aside, and they must follow the rules which the reason of safety has dictated.

"Steam vessels are of modern origin, but it is not at all difficult to apply the rules of common law to their navigation. The life of the law is in its reason, and the reason of the rules as to sailing vessels is applied at once to steam vessels, when we consider that they are as manageable as a sailing vessel with the wind free, and more so. Therefore, a steam vessel meeting a steam vessel, both are equal, and both must port their helm. A steam vessel must port her helm when meeting a sailing vessel, or any less manageable craft. There are some plain exceptions to this; thus, when a steam vessel is coming up, or going down, close to the right-hand shore, she is not to port helm, for she would run ashore, but the other must give way. So, also, where a steam vessel is going down a narrow channel where it would be dangerous for two to pass, she cannot safely change her course, and she cannot back out, therefore the vessel coming up must wait on her, or back out.

"The duty of safety requires that both vessels should attempt

[Lockwood *v.* Lashell.]

to pass under each other's stern, in case of danger of collision. You know, by the experience of this case, how difficult it is to calculate distances when both parties are on the water, and the stand point of both is moving. It is, therefore, considered a false move for one vessel to pass under the bows of another. Thus, when a sailing vessel, with the wind free, meets another close hauled, she should get out of her way by passing under her stern, whether this takes her to larboard or starboard. Where the safety of one vessel requires the adoption of preventive and precautionary measures on the part of another, and this be not done, and damage ensues, he who was guilty of the omission must bear the loss.

"But the great common law rule for vessels meeting in a clear river, or on the open sea, is, that vessels having equal command of the means of changing their course, shall each port their helm in case of danger of collision. * * * * The rule, port your helm, is still the law of the river, as, go to the right, is the law of the road. This rule, and the rule that no vessel should attempt to cross under the *bows* of another, seem to me to be the rules by which we are to decide this case. If the Caroline made the move which the defendant's witnesses think she did, it was, I think, a false move, and she cannot recover. For her false move may have led to a false move of the Consignee. But did she? You have heard the testimony, and you have to decide upon it. You are to judge by these principles which boat was in the wrong, if either, and find accordingly."

Verdict for plaintiffs for $4000 damages.

Error was assigned to the positions stated in the last three paragraphs in the charge.

*Loomis* and *Gilmore*, for plaintiffs in error.—It was contended, 1. That there is no rule of law, applicable to the navigation of the Ohio river, requiring steam vessels moving to port their helm.

2. That the duty of safety does not require, nor would the attainment of safety be promoted by vessels attempting, in every instance, in danger of collision, to pass under each other's stern; that it is not uniformly regarded as a false move for one vessel to pass under the bows of another.

3. That there is no such common law rule in force on the western waters, as is supposed and stated in the beginning of the last paragraph above cited from the charge. That which was substituted by the pilots on the river, men of capacity and experience in navigation, signals and regulations established to' guard against collisions and accidents in case of emergency, is entitled to consideration and influence with the jury, in the determination of a difficult case. That the unqualified direction to the jury, that "port your helm" is still the law of the river, as "go to the right"

[Lockwood *v.* Lashell,]

is the law of the road, when the rule, if it exist at all, is influenced
and modified by a great variety of circumstances, and is subject
to a multitude of exceptions wholly unexplained to the jury, was
calculated to mislead them, and was erroneous : 14 *Eng. Common
Law Reports*, 431, Handayside *v.* Wilson.

*Shaler* and *Stanton*, for defendants in error.

The opinion of the Court was delivered, Oct. 7, by
LEWIS, J.—This, in the Court below, was an action to recover
damages in an action on the case, brought by the owners of the
steamboat Caroline, against the owners of the steamboat Con-
signee, to recover damages occasioned by a collision.   The injury
occurred on the 9th of March, 1849, on the Ohio river, in the state
of Virginia, a short distance above Steubenville, Ohio.   The Caro-
line was a small stern-wheel boat, and was ascending the river.
The Consignee was a large side-wheel St. Louis boat, and was
descending the river.

The owners of the Caroline obtained a verdict and judgment in
their favor for the sum of four thousand dollars damages.   To
reverse this judgment this writ of error was taken by the owners
of the Consignee.

The errors assigned are three in number, but they refer to dif-
ferent forms of expressing the same principle, and may be dis-
posed of by the decision of a single question.   Is it a rule of
navigation, recognised by law, that steam vessels, meeting each
other in a clear river, or on the open sea, *shall each pass to the
right*, in case of danger of collision?

In husbandry, in the mechanic arts, and in the various other
pursuits of life, every one is required to exercise his calling accord-
ing to the most approved lights and rules of the art or science
which he professes to practise.   This rule is founded upon princi-
ples of natural justice, and sustained by the highest considerations
of public policy.   A steady adherence to it stimulates the advance
of useful improvements, and promotes the comfort and security of
all.   Why should the pursuit of navigation be exempt from its
operation?   Why should those who are intrusted more than any
other class with the care of life and property, be exempt from a
rule so indispensable to the safety of both?   No just reason can
be assigned why this great art, sustaining as it does the commer-
cial interests of the world, should be placed in a state of outlawry.
Those engaged in it are assuredly bound by the rules which are the
result of the practical experience and wisdom of navigators, as
strongly as others are required, to exercise ordinary skill and care
in their respective occupations.

Among the nautical rules applicable to the navigation of sailing
vessels are the following: A vessel which has the wind free, or

[Lockwood v. Lashell.]

sailing before or with the wind, must get out of the way of the vessel that is close hauled, or sailing against it; and the vessel on the starboard tack has a right to keep her course, *and the one on the larboard tack must give way*, or be answerable for the consequences. So, when two vessels are approaching each other, both having the wind free, and consequently the power of readily controlling their movements, *the vessel on the larboard tack must give way*, and *each pass to the right.* The same rule governs vessels sailing on the wind, and approaching each other, when it is doubtful which is to windward. These principles are sustained by abundant authority: 1 *Wm. Rob.* 483; 2 *Id.* 197, 189; 3 *Hagg.* 316; *Id.* 320; *Id.* 327; 2 *Dodson* 86; 5 *Rob.* 345; 3 *C. & P.* 528; 9 *Id.* 601; 12 *Moore* 148; 3 *Kent's Com.* 230; 10 *How. U. S. R.* 581. The reason why the vessel on the starboard tack has a right to keep her course, is, because her helm is already put to port, in accordance with what has been called the "golden rule of navigation;" and the reason why "the one on the larboard tack must give way" is, because the further progress in her course would be a violation of that rule.

And when it is said that if two vessels are approaching each other, both having the wind free, they must "each pass to the right," the duty of porting the helm is imposed upon both, because both have the power of "readily controlling their movements." As "the reason of the law is the life of the law," it necessarily follows that the like obligation rests upon steamboats, because they possess entire control over their movements. They are therefore required to do whatever sailing vessels going free, or with a fair wind, would be required to do under similar circumstances. There is this difference, however, between steamers and sailing vessels, that the former, having greater control over their movements than the latter, even with a fair wind, are held to a stricter rule of responsibility. In the case of Lowrey v. The Steamboat Portland, in the United States District Court for Massachusetts, in January, 1839, it was *certified by experienced navigators*, and *adjudged by the Court* as the rule on the subject, that "when two vessels approach each other, both having a free or fair wind, *each vessel passes to the right;* and that a steamer was considered as always sailing with a fair wind, and is bound to do whatever a sailing vessel going free, or with a fair wind, would be required to do under similar circumstances: 3 *Kent's Com.* 231, n., &c. Nearly two years afterwards, on 30th Oct. 1840, the experienced navigators of Trinity House, a corporation of pilots which has existed under different charters ever since the reign of Henry VIII., "recognised" the existence of the same rules of navigation. So far from professing to establish for the first time even the application of the old rule to steamers, they expressly declare that, "on communication with the Lords Commissioners of the

2 G

[Lockwood *v.* Lashell.]

Admiralty, the elder brethren find *it has been already adopted* in respect to steam vessels in her majesty's service." These rules of navigation have been frequently revised in admiralty cases in the District Court. And in 1850, they were strongly enforced by the Supreme Court of the United States: 10 *Howard* 581. And it is there declared to be the obvious duty of the Court to "apply them strictly in all cases of collision, unless where a clear exception is established by the party seeking to excuse himself for the departure:" *Id.*

It is undoubtedly true, that no vessel, especially a steamer, should unnecessarily incur the probability of a collision by a pertinacious adherence to the particular rule in question here: 1 *W. Rob.* 157. Even the Trinity House regulations acknowledge the necessity of occasional departures from it, when they declare that steam vessels should "give way to sailing vessels on a wind on either tack." The expression "giving way" does not mean the putting the helm to port under *all* circumstances; but *porting* or *starboarding* the helm, as the exigencies may require:" The Gazelle, 10 *Jur.* 1066. Indeed, steamers have frequently been condemned for porting the helm under circumstances which required a departure from the rule: 10 *Jur.* 1066; 2 *W. Rob.* 270; 8 *Jur.* 320; 3 *Notes of Cases* 36. When either vessel is in such a condition as to render it manifest that porting the helm would produce a collision, the vessel on the right course is justified, in spite of the rule, in putting the helm to starboard: 4 *Moore* 314. We subscribe to the remarks of Dr. Lushington, that "there must be exceptions to the rule implied by common sense:" The Rose, *Adm.* Hil. Term, 1843.

But when the Court instructed the jury correctly in regard to the general rule, it is not error that all the exceptions to it were not stated. The party who claims that his case is an exception, must show in the evidence the particular circumstances which take his case out of the general rule. It is not to be expected that the Court below is to deliver a treatise upon navigation, or that this Court can reverse upon an abstraction. Experience has shown that instructions given to the jury upon principles not arising in the case, only tend to divert their attention from the real question of the cause. The learned Judge, before whom this cause was tried, was perfectly correct in confining himself to the particular exception relied upon and presented by the evidence. From the paper-book, it would seem, that the defendants below insisted that " when the Caroline was discovered, she was ascending the Ohio shore, and that as the Consignee approached, the course of the Caroline was suddenly changed across the river, so as to pass improperly under the bows of the Consignee." In reference to this ground of defence the Judge instructed the jury, that "if the Caroline made the movement which the defendants' witnesses think

[Lockwood v. Lashell.]

she did, it was, I think, a false move, and she cannot recover; for her false move may have led to a false move of the Consignee." This question of fact was submitted to the jury, and they have found it against the plaintiffs in error. The error, if there be one, lies with them, and their decision is not the subject of revision on a writ of error. The instructions given were perfectly correct.

Judgment affirmed.